The MARTIN LUTHER KING, JR., CENTER FOR SOCIAL CHANGE, INC.; Mrs. Coretta Scott King, Administratrix of the Estate of Dr. Martin Luther King, Jr., Deceased; and Motown Record Corporation, Plaintiffs-Appellants,

v.

AMERICAN HERITAGE PRODUCTS, INC.; B & S Sales, Inc., a/k/a B & S Sales; and James E. Bolen and James F. Bolen, Defendants-Appellees.

No. 81–7264.

United States Court of Appeals, Eleventh Circuit.

Jan. 3, 1983.

See also 296 S.E.2d 697.

Ruppert, Bronson & Chciarelli, James D. Ruppert, Franklin, Ohio, for defendants-appellees.

Harmon, Smith & Bridges, Archer D. Smith, III, Atlanta, Ga., for plaintiffs-appellants.

Before HENDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

In our previous consideration of this case, *The Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc.,* No. 81–7264 (11th Cir., Apr. 1, 1982), we certified the following questions to the Supreme Court of Georgia pursuant to Georgia Code Annotated § 24–3902 permitting such procedure:

(1) Is the "right to publicity" recognized in Georgia as a right distinct from the right to privacy?

(2) If the answer to question (1) is affirmative, does the "right to publicity" survive the death of its owner? Specifically, is the right inheritable and devisable?

(3) If the answer to question (2) is also affirmative, must the owner have commercially exploited the right before it can survive his death?

(4) Assuming affirmative answers to questions (1), (2) and (3), what is the guideline to be followed in defining commercial exploitation and what are the evidentiary prerequisites to a showing of commercial exploitation?

The Supreme Court of Georgia, *The Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc.,* —— Ga. ——, 296 S.E.2d 697 (1982), has answered questions (1) and (2) affirmatively and question (3) in the nega-

tive in an opinion attached hereto as Exhibit A.[1]

Pursuant to this opinion, the opinion of the Supreme Court of Georgia, and that court's answers to the first three certified questions, we reverse the judgment of the district court and remand for further proceedings.

REVERSED and REMANDED.

Exhibit A

In the Supreme Court of Georgia

Decided: Oct. 28, 1982

38748. The MARTIN LUTHER KING, JR., CENTER FOR SOCIAL CHANGE, INC., et al. v. AMERICAN HERITAGE PRODUCTS, INC., et al.

HILL, Presiding Justice.

These are certified questions regarding the "right of publicity". The certification comes from the United States Court of Appeals for the Eleventh Circuit. Code Ann. § 24–3902; see *Miree v. United States of America*, 242 Ga. 126, 131–133, 249 S.E.2d 573 (1978). The facts upon which the questions arise are as follows: [1]

The plaintiffs are the Martin Luther King, Jr. Center for Social Change (the Center),[2] Coretta Scott King, as administratrix of Dr. King's estate, and Motown Record Corporation, the assignee of the rights to several of Dr. King's copyrighted speeches. Defendant James F. Bolen is the sole proprietor of a business known as B & S Sales, which manufactures and sells various plastic products as funeral accessories. Defendant James E. Bolen, the son of James F. Bolen, developed the concept of marketing a plastic bust of Dr. Martin Luther King, Jr., and formed a company, B & S Enterprises, to sell the busts, which would be manufactured by B & S Sales. B & S Enterprises was later incorporated under the name of American Heritage Products, Inc.

Although Bolen sought the endorsement and participation of the Martin Luther King, Jr. Center for Social Change, Inc., in the marketing of the bust, the Center refused Bolen's offer. Bolen pursued the idea, nevertheless, hiring an artist to prepare a mold and an agent to handle the promotion of the product. Defendant took out two half-page advertisements in the November and December 1980 issues of Ebony magazine, which purported to offer the bust as "an exclusive memorial" and "an opportunity to support the Martin Luther King, Jr., Center for Social Change." The advertisement stated that "a contribution from your order goes to the King Center for Social Change." Out of the $29.95 purchase price, defendant Bolen testified he set aside 3% or $.90, as a contribution to the Center. The advertisement also offered "free" with the purchase of the bust a booklet about the life of Dr. King entitled "A Tribute to Dr. Martin Luther King, Jr."

In addition to the two advertisements in Ebony, defendant published a brochure or pamphlet which was inserted in 80,000 copies of newspapers across the country. The brochure reiterated what was stated in the magazine advertisements, and also contained photographs of Dr. King and excerpts from his copyrighted speeches. The brochure promised that each "memorial" (bust) is accompanied by a Certificate of Appreciation "testifying that a contribution has been made to the Martin Luther King, Jr., Center for Social Change."

Defendant James E. Bolen testified that he created a trust fund for that portion of the earnings which was to be contributed to the Center. The trust fund agreement, however, was never executed, and James E. Bolen testified that this was due to the plaintiffs' attorneys' request to cease and desist from all activities in issue. Testimony in the district court disclosed that money had been tendered to the Center, but was not accepted by its governing board. Also, the district court found that, as of the date

1. Having answered question (3) negatively, the court declined to answer question (4).

1. The statement of facts is taken almost verbatim from the Court of Appeals' certification.

For convenience, the parties will be identified as they appeared in the district court.

2. The Center is a non-profit corporation which seeks to promote the ideals of Dr. King.

of the preliminary injunction, the defendants had sold approximately 200 busts and had outstanding orders for 23 more.

On November 21, 1980, and December 19, 1980, the plaintiffs demanded that the Bolens cease and desist from further advertisements and sales of the bust, and on December 31, 1980, the plaintiffs filed a complaint in the United States District Court for the Northern District of Georgia. The district court held a hearing on the plaintiffs' motion for a preliminary injunction and the defendants' motion to dismiss the complaint. The motion to dismiss was denied and the motion for a preliminary injunction was granted in part and denied in part. The motion for an injunction sought (1) an end to the use of the Center's name in advertising and marketing the busts, (2) restraint of any further copyright infringement and (3) an end to the manufacture and sale of the plastic busts. The defendants agreed to discontinue the use of the Center's name in further promotion. Therefore, the court granted this part of the injunction. The district court found that the defendants had infringed the King copyrights and enjoined all further use of the copyrighted material.

In ruling on the third request for injunction, the court confronted the plaintiffs' claim that the manufacture and sale of the busts violated Dr. King's right of publicity which had passed to his heirs upon Dr. King's death. The defendants contended that no such right existed, and hence, an injunction should not issue. The district court concluded that it was not necessary to determine whether the "right of publicity" was devisable in Georgia because Dr. King did not commercially exploit this right during his lifetime. As found by the district court, the evidence of exploitation by Dr. King came from his sister's affidavit which stated that he had received "thousands of dollars in the form of honorariums from the use of his name, likeness, literary compositions, and speeches." The district court further found that "Dr. King apparently sold his copyrights in several speeches to Motown Records Corporation." *Martin Luther King, Jr. Center for Social Change,* *Inc. v. American Heritage Products, Inc.,* 508 F.Supp. 854 (N.D.Ga.1981).

On plaintiffs' appeal of the partial denial of the preliminary injunction, the Eleventh Circuit Court of Appeals has certified the following questions:

(1) Is the "right of publicity" recognized in Georgia as a right distinct from the right of privacy?

(2) If the answer to question (1) is affirmative, does the "right to publicity" survive the death of its owner? Specifically, is the right inheritable and devisable?

(3) If the answer to question (2) is also affirmative, must the owner have commercially exploited the right before it can survive his death?

(4) Assuming the affirmative answers to questions (1), (2) and (3), what is the guideline to be followed in defining commercial exploitation and what are the evidentiary prerequisites to a showing of commercial exploitation?

As noted by the Eleventh Circuit, this case raises questions concerning the laws of Georgia as to which there are no controlling precedents directly on point. In addition to being novel in this jurisdiction, the questions are legally alluring. Under these twin circumstances, it is necessary in the first instance to consider how the answers to the questions apply to other fact situations, and tempting in the second instance to include those considerations in writing. Hopefully having considered the various ramifications, we will resist to the extent possible the temptation to answer more than has been asked.

The right of publicity may be defined as a celebrity's right to the exclusive use of his or her name and likeness. *Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836, 843 (S.D.N.Y.1975); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1353 (D.N.J.1981), and cases cited. The right is most often asserted by or on behalf of professional athletes, comedians, actors and actresses, and other entertainers. This case involves none of those occupations. As is known to

all, from 1955 until he was assassinated on April 4, 1968, Dr. King, a Baptist minister by profession, was the foremost leader of the civil rights movement in the United States. He was awarded the Nobel Prize for Peace in 1964. Although not a public official, Dr. King was a public figure, and we deal in this opinion with public figures who are neither public officials nor entertainers. Within this framework, we turn to the questions posed.

1. Is the "right of publicity" recognized in Georgia as a right distinct from the right of privacy?

Georgia has long recognized the right of privacy. Following denial of the existence of the right of privacy in a controversial decision by the New York Court of Appeals in *Roberson v. Rochester Folding-Box Co.,* 171 N.Y. 538, 64 N.E. 442 (1902), the Georgia Supreme Court became the first such court to recognize the right of privacy in *Pavesich v. New England Life Ins. Co.,* 122 Ga. 190, 50 S.E. 68 (1905). See Prosser, Law of Torts, pp. 802–804 (1971).

In *Pavesich v. New England Life Ins. Co.,* supra, the picture of an artist was used without his consent in a newspaper advertisement of the insurance company. Analyzing the right of privacy, this court held: "The publication of a picture of a person, without his consent, as a part of an advertisement, for the purpose of exploiting the publisher's business, is a violation of the right of privacy of the person whose picture is reproduced, and entitles him to recover without proof of special damage." 122 Ga. at 191(11), 50 S.E. at 68(11). If the right to privacy had not been recognized, advertizers could use photographs of private citizens to promote sales and the professional modeling business would not be what it is today.

In the course of its opinion the *Pavesich* court said several things pertinent here. It noted that the commentators on ancient law recognized the right of personal liberty, including the right to exhibit oneself before the public at proper times and places and in a proper manner. As a corollary, the court recognized that the right of personal liberty included the right of a person not to be exhibited before the public, saying: "The right to withdraw from the public gaze at such times as a person may see fit, when his presence in public is not demanded by any rule of law is also embraced within the right of personal liberty. Publicity in one instance and privacy in the other is each guaranteed. If personal liberty embraces the *right of publicity,* it no less embraces the correlative right of privacy; and this is no new idea in Georgia law." 122 Ga. at 196, 50 S.E. at 70. (Emphasis supplied.)

Recognizing the possibility of a conflict between the right of privacy and the freedoms of speech and press, this court said: "There is in the publication of one's picture for advertising purposes not the slightest semblance of an expression of an idea, a thought, or an opinion, within the meaning of the constitutional provision which guarantees to a person the right to publish his sentiments on any subject." 122 Ga. at 219, 50 S.E. at 80. The defendants in the case now before us make no claim under these freedoms and we find no violation thereof.

Observing in dicta that the right of privacy in general does not survive the death of the person whose privacy is invaded, the *Pavesich* court said: "While the right of privacy is personal, and may die with the person, we do not desire to be understood as assenting to the proposition that the relatives of the deceased can not, in a proper case, protect the memory of their kinsman, not only from defamation, but also from an invasion into the affairs of his private life after his death. This question is not now involved, but we do not wish anything said to be understood as committing us in any way to the doctrine that against the consent of relatives the private affairs of a deceased person may be published and his picture or statue exhibited." 122 Ga. at 210, 50 S.E. at 76.

Finding that Pavesich, although an artist, was not recognized as a public figure, the court said: "It is not necessary in this case to hold, nor are we prepared to do so, that the mere fact that a man has become what is called a public character, either by aspir-

ing to public office, or by holding public office, or by exercising a profession which places him before the public, or by engaging in a business which has necessarily a public nature, gives to every one the right to print and circulate his picture." 122 Ga. at 217–218, 50 S.E. at 79–80. Thus, although recognizing the right of privacy, the *Pavesich* court left open the question facing us involving the likeness of a public figure.[3]

The "right of publicity" was first recognized in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953). There plaintiff had acquired by contract the exclusive right to use certain ball players' photographs in connection with the sales of plaintiff's chewing gum. An independent publishing company acquired similar rights from some of the same ball players. Defendant, a chewing gum manufacturer competing with plaintiff and knowing of plaintiff's contracts, acquired the contracts from the publishing company. As to these contracts the court found that the defendant had violated the ball players' "right of publicity" acquired by the plaintiff, saying (at 868): "We think that, in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph, i.e., the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made 'in gross,' i.e., without an accompanying transfer of a business or of anything else. Whether it be labelled a 'property' right is immaterial; for here, as often elsewhere, the tag 'property' simply symbolizes the fact that courts enforce a claim which has pecuniary worth.

"This right might be called a 'right of publicity.' For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures."

In *Palmer v. Schonhorn Enterprises, Inc.*, 96 N.J.Super. 72, 232 A.2d 458 (1967), Arnold Palmer, Gary Player, Doug Sanders and Jack Nicklaus obtained summary judgment against the manufacturer of a golf game which used the golfers' names and short biographies without their consent. Although written as a right of privacy case, much of what was said is applicable to the right of publicity. In its opinion the court said (232 A.2d at 462): "It would therefore seem, from a review of the authorities, that although the publication of biographical data of a well-known figure does not per se constitute an invasion of privacy, the use of that same data for the purpose of capitalizing upon the name by using it in connection with a commercial project other than the dissemination of news or articles or biographies does.

"The names of plaintiffs have become internationally famous, undoubtedly by rea-

---

3. Following *Pavesich*, supra, this court has continued to recognize the right of privacy. In *Bazemore v. Savannah Hospital*, 171 Ga. 257, 155 S.E. 194 (1930), the court held that the parents of a child born with his heart outside his body, who died following surgery, could maintain a suit for invasion of their privacy against the hospital, a photographer and a newspaper which respectively allowed, photographed and published a nude post mortem picture of the child.

On the other hand, in *Waters v. Fleetwood*, 212 Ga. 161, 91 S.E.2d 344 (1956), it was held that the mother of a 14 year old murder victim could not recover for invasion of the mother's

privacy from a newspaper which published and sold separately photographs of her daughter's body taken after it was removed from a river. There the court found that publication and reproduction for sale of a photograph incident to a matter of public interest or to a public investigation could not be a violation of anyone's right of privacy. See also *Georgia Gazette Publishing Co. v. Ramsey*, 248 Ga. 528, 284 S.E.2d 386 (1981). For other Georgia cases involving the right of privacy, see *Tanner-Brice Co. v. Sims*, 174 Ga. 13(4), 161 S.E. 819 (1931); *Goodyear Tire & Rubber Co. v. Vandergriff*, 52 Ga.App. 662, 184 S.E. 452 (1935).

son of talent as well as hard work in perfecting it. This is probably true in the cases of most so-called celebrities, who have attained national or international recognition in a particular field of art, science, business or other extraordinary ability. They may not all desire to capitalize upon their names in the commercial field, beyond or apart from that in which they have reached their known excellence. However, because they presently do not should not be justification for others to do so because of the void. They may desire to do it later. . . . It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have been highly publicized."

In *Haelan Laboratories,* supra, the court was concerned with whether a celebrity has the right to the exclusive use of his or her name and likeness. In *Palmer,* supra, the court was concerned with whether a person using the celebrity's name for the user's commercial benefit has the right to do so without authorization. At this point it should be emphasized that we deal here with the unauthorized use of a person's name and likeness for the commercial benefit of the user, not with a city's use of a celebrity's name to denominate a street or school.

The right to publicity is not absolute. In *Hicks v. Casablanca Records,* 464 F.Supp. 426 (S.D.N.Y.1978), the court held that a fictional novel and movie concerning an unexplained eleven day disappearance by Agatha Christie, author of numerous mystery novels, were permissible under the first amendment. On the other hand, in *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), a television station broadcast on its news program plaintiff's 15 second "human cannonball" flight filmed at a local fair. The Supreme Court held that freedom of the press does not authorize the media to broadcast a performer's entire act without his consent, just as the media could not televise a stage play, prize fight or baseball game without consent. Quoting from Kal-

ven, Privacy in Tort Law—Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 332 (1966), the Court said (433 U.S. at 576, 97 S.Ct. at 2857): "The rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay."

The right of publicity was first recognized in Georgia by the Court of Appeals in *Cabaniss v. Hipsley,* 114 Ga.App. 367, 151 S.E.2d 496 (1966). There the court held that the plaintiff, an exotic dancer, could recover from the owner of the Atlanta Playboy Club for the unauthorized use of the dancer's misnamed photograph in an entertainment magazine advertising the Playboy Club. Although plaintiff had had her picture taken to promote her performances, she was not performing at the Playboy Club. The court used Dean William L. Prosser's four pronged analysis of the right of privacy, saying: ". . . Dean Prosser has analyzed the many privacy cases in an article entitled 'Privacy,' published in 48 Calif. L.Rev. 383 (1960), and in reviewing the cases he suggests that the invasion of privacy is in reality a complex of four loosely related torts; that there are four distinct kinds of invasion of four different interests of plaintiff; that there are four disparate torts under a common name. These four torts may be described briefly as: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." 114 Ga.App. at 370, 151 S.E.2d at 499–500. Finding no violation of the first three rights of privacy, the court found a violation of the fourth, saying (114 Ga.App. at 377, 151 S.E.2d 496): "Unlike intrusion, disclosure, or false light, appropriation does not require the invasion of something secret, secluded or private per-

taining to plaintiff, nor does it involve falsity. It consists of the appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness. * * * 'The interest protected [in the "appropriation" cases] is not so much a mental as a proprietary one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity.' Prosser, supra, at 406." Although Ms. Hipsley was an entertainer (i.e., a public figure), the court found she was entitled to recover from the Playboy Club (but not from the magazine which published the Club's ad) for the unauthorized use of her photograph. However the court noted a difference in the damages recoverable in traditional right of privacy cases as opposed to right of publicity cases saying (114 Ga. App. at 378, 151 S.E.2d 496): "Recognizing, as we do, the fundamental distinction between causes of action involving injury to feelings, sensibilities or reputation and those involving an appropriation of rights in the nature of property rights for commercial exploitation, it must necessarily follow that there is a fundamental distinction between the two classes of cases in the measure of damages to be applied. In the former class (which we take to include the intrusion, disclosure, and false light aspects of the privacy tort), general damages are recoverable without proof of special damages. *Pavesich v. New England Life Ins. Co.,* supra. In the latter class, the measure of damages is the value of the use of the appropriated publicity."

In *McQueen v. Wilson,* 117 Ga.App. 488, 161 S.E.2d 63, reversed on other grounds, 224 Ga. 420, 162 S.E.2d 313 (1968), the Court of Appeals upheld the right of an actress, Butterfly McQueen, who appeared as "Prissie" in the movie *Gone With the Wind,* to recover for the unauthorized use of her photograph, saying: "Both before and since *Pavesich* it has been recognized that the appropriation of another's identity, picture, papers, name or signature without consent and for financial gain might be a tort for which an action would lie...." 117 Ga. App. at 491, 161 S.E.2d at 65.

Thus, the courts in Georgia have recognized the rights of private citizens, *Pave-sich,* supra, as well as entertainers, *Cabaniss* and *McQueen,* supra, not to have their names and photographs used for the financial gain of the user without their consent, where such use is not authorized as an exercise of freedom of the press. We know of no reason why a public figure prominent in religion and civil rights should be entitled to less protection than an exotic dancer or a movie actress. Therefore, we hold that the appropriation of another's name and likeness, whether such likeness be a photograph or sculpture, without consent and for the financial gain of the appropriator is a tort in Georgia, whether the person whose name and likeness is used is a private citizen, entertainer, or as here a public figure who is not a public official.

In *Pavesich,* supra, 122 Ga. 190, 50 S.E. 68, this right not to have another appropriate one's photograph was denominated the right of privacy; in *Cabaniss v. Hipsley,* supra, 114 Ga.App. 367, 151 S.E.2d 496, it was the right of publicity. Mr. Pavesich was not a public figure; Ms. Hipsley was. We conclude that while private citizens have the right of privacy, public figures have a similar right of publicity, and that the measure of damages to a public figure for violation of his or her right of publicity is the value of the appropriation to the user. *Cabaniss v. Hipsley,* supra; see also *Uhlaender v. Henricksen,* 316 F.Supp. 1277, 1279–1280 (Minn.1970). As thus understood the first certified question is answered in the affirmative.

2. Does the "right of publicity" survive the death of its owner (i.e., is the right inheritable and devisable)?

Although the *Pavesich* court expressly did not decide this question, the tenor of that opinion is that the right to privacy at least should be protectable after death. *Pavesich,* supra, 122 Ga. at 210, 50 S.E. at 76.

The right of publicity is assignable during the life of the celebrity, for without this characteristic, full commercial exploitation of one's name and likeness is practically impossible. *Haelan Laboratories v. Topps*

*Chewing Gum,* supra, 202 F.2d at 868. That is, without assignability the right of publicity could hardly be called a "right". Recognizing its assignability, most commentators have urged that the right of publicity must also be inheritable. Felcher and Rubin, The Descendibility of the Right of Publicity: Is there Commercial Life After Death?, 89 Yale L.J. 1125 (1980); Gordon, Right of Property in Name, Likeness, Personality and History, 55 U.L.Rev. 553 (1960); Comment, 14 Ga.L.Rev. 831 (1980); Note, 47 Tenn.L.Rev. 886 (1980); Note, 33 Vand.L.Rev. 1251 (1980); Comment, 29 Hastings L.J. 751 (1978); Comment, 42 Brooklyn L.Rev. 527 (1976); Comment, 22 U.C.L.A.L.Rev. 1103 (1975).

The courts that have considered the problem are not as unanimous. In *Price v. Hal Roach Studios, Inc.,* supra, 400 F.Supp. 836, the court reasoned that since the right of publicity was assignable, it survived the deaths of Stanley Laurel and Oliver Hardy. Other decisions from the Southern District of New York recognize the descendibility of the right of publicity, which has also been recognized by the Second Circuit Court of Appeals (infra).

In *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215 (2d Cir.1978), Elvis Presley had assigned his right of publicity to Boxcar Enterprises, which assigned that right to Factors after Presley's death. Defendant Pro Arts published a poster of Presley entitled "In Memory". In affirming the grant of injunction against Pro Arts, the Second Circuit Court of Appeals said (579 F.2d at 221): "The identification of this exclusive right belonging to Boxcar as a transferable property right compels the conclusion that the right survives Presley's death. The death of Presley, who was merely the beneficiary of an income interest in Boxcar's exclusive right, should not in itself extinguish Boxcar's property right. Instead, the income interest, continually produced from Boxcar's exclusive right of commercial exploitation, should inure to Presley's estate at death like any other intangible property right. To hold that the right did not survive Presley's death, would be to grant competitors of Factors, such as Pro Arts, a windfall in the form of profits from the use of Presley's name and likeness. At the same time, the exclusive right purchased by Factors and the financial benefits accruing to the celebrity's heirs would be rendered virtually worthless."

In *Lugosi v. Universal Pictures,* 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979), the Supreme Court of California, in a 4 to 3 decision, declared that the right of publicity expires upon the death of the celebrity and is not descendible. See *Guglielmi v. Spelling-Goldberg Productions,* 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454 (1979), decided two days after *Lugosi,* supra. Bela Lugosi appeared as Dracula in Universal Picture's movie by that name. Universal had acquired the movie rights to the novel by Bram Stoker. Lugosi's contract with Universal gave it the right to exploit Lugosi's name and likeness in connection with the movie. The majority of the court held that Lugosi's heirs could not prevent Universal's continued exploitation of Lugosi's portrayal of Count Dracula after his death. The court did not decide whether Universal could prevent unauthorized third parties from exploitation of Lugosi's appearance as Dracula after Lugosi's death.

In *Memphis Development Foundation v. Factors Etc., Inc.,* 616 F.2d 956 (6th Cir. 1980), Factors, which had won its case against Pro Arts in New York (see above), lost against the Memphis Development Foundation under the Court of Appeals for the Sixth Circuit's interpretation of Tennessee law. There, the Foundation, a nonprofit corporation, planned to erect a statue of Elvis Presley in Memphis and solicited contributions to do so. Donors of $25 or more received a small replica of the proposed statue. The Sixth Circuit reversed the grant of an injunction favoring Factors, holding that a celebrity's right of publicity was not inheritable even where that right had been exploited during the celebrity's life.[4] The court reasoned that although rec-

---

4. The Second Circuit has now accepted the Sixth Circuit's interpretation of Tennessee law.

*Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278 (2d Cir., 1981).

ognition of the right of publicity during life serves to encourage effort and inspire creative endeavors, making the right inheritable would not. The court also was concerned with unanswered legal questions which recognizing inheritability would create. We note, however, that the court was dealing with a non-profit foundation attempting to promote Presley's adopted homeplace, the City of Memphis. The court was not dealing, as we do here, with a profit making endeavor.

In *Estate of Presley v. Russen,* supra, 513 F.Supp. 1339, the court found in favor of descendibility, quoting from Chief Justice Bird's dissent in *Lugosi v. Universal Pictures,* supra, 160 Cal.Rptr. at 332, 603 P.2d at 434, and saying: "If the right is descendible, the individual is able to transfer the benefits of his labor to his immediate successors and is assured that control over the exercise of the right can be vested in a suitable beneficiary. There is no reason why, upon a celebrity's death, advertisers should receive a windfall in the form of freedom to use with impunity the name or likeness of the deceased celebrity who may have worked his or her entire life to attain celebrity status. The financial benefits of that labor should go to the celebrity's heirs....'" 513 F.Supp. at 1355.

For the reasons which follow we hold that the right of publicity survives the death of its owner and is inheritable and devisable. Recognition of the right of publicity rewards and thereby encourages effort and creativity. If the right of publicity dies with the celebrity, the economic value of the right of publicity during life would be diminished because the celebrity's untimely death would seriously impair, if not destroy, the value of the right of continued commercial use. Conversely, those who would profit from the fame of a celebrity after his or her death for their own benefit and without authorization have failed to establish their claim that they should be the beneficiaries of the celebrity's death. Finally, the trend since the early common law has been to recognize survivability, notwithstanding the legal problems which may thereby arise. We therefore answer question 2 in the affirmative.

3. Must the owner of the right of publicity have commercially exploited that right before it can survive?

Exploitation is understood to mean commercial use by the celebrity other than the activity which made him or her famous, e.g., an inter vivos transfer of the right to the use of one's name and likeness.

The requirement that the right of publicity be exploited by the celebrity during his or her lifetime in order to render the right inheritable arises from the case involving Agatha Christie, *Hicks v. Casablanca Records,* supra, 464 F.Supp. at 429. The Hicks court cited three authorities, *Factors Etc., Inc. v. Pro Arts, Inc.,* supra, 579 F.2d at 222 (n. 11); *Guglielmi v. Spelling-Goldberg Prods.,* 73 Cal.App.3d 436, 140 Cal.Rptr. 775 (1977); and "see also" *Price v. Hal Roach Studios, Inc.,* supra, 400 F.Supp. 836. However, footnote 11 in *Factors v. Pro Arts,* supra, shows that the issue was not decided there. The Guglielmi case, brought by an heir of Rudolpho Valentino, involved the movie "Legend of Valentino: A Romantic Fiction", and the California Court of Appeals decision in that case was affirmed on the ground of nondescendibility. *Guglielmi v. Spelling-Goldberg Productions,* supra, 603 P.2d 459. And in *Price v. Hal Roach Studios, Inc.,* supra, the court said: "There cannot, therefore, be any necessity to exercise the right of publicity during one's life in order to protect it from use by others or to preserve any potential right of one's heirs." 400 F.Supp. at 846. Moreover, the Hicks court held that the fictional account of Agatha Christie's 11 day disappearance was protected by the first amendment. Thus, the finding that exploitation during life was necessary to inheritability was actually unnecessary to that decision.

Nevertheless, the Hicks dicta has been relied upon. See *Groucho Marx Productions, Inc. v. Day & Night Co.,* 523 F.Supp.

485, 490 (S.D.N.Y.1981).[5] However, in this case, involving the Marx brothers, it was found that, although Leo and Adolpho Marx ("Chico" and "Harpo") had not made inter vivos or specific testamentary dispositions of their rights, they had earned their livelihoods by exploiting the unique characters they created and thus had exploited their rights to publicity so as to make such rights descendible. Thus, even in the Southern District of New York where the requirement arose, exploitation beyond the "activity which made him or her famous" is not now required.

The cases which have considered this issue, see above, involved entertainers. The net result of following them would be to say that celebrities and public figures have the right of publicity during their lifetimes (as others have the right of privacy), but only those who contract for bubble gum cards, posters and tee shirts have a descendible right of publicity upon their deaths. See *Groucho Marx Productions, Inc. v. Day & Night Co.,* supra, 523 F.Supp. at 490, 491–492. That we should single out for protection after death those entertainers and athletes who exploit their personae during life, and deny protection after death to those who enjoy public acclamation but did not exploit themselves during life, puts a premium on exploitation. Having found that there are valid reasons for recognizing the right of publicity during life, we find no reason to protect after death only those who took commercial advantage of their fame.

Perhaps this case more than others brings the point into focus. A well known minister may avoid exploiting his prominence during life because to do otherwise would impair his ministry. Should his election not to take commercial advantage of his position during life ipso facto result in permitting others to exploit his name and likeness after his death? In our view, a person who avoids exploitation during life is entitled to have his image protected against exploitation after death just as much if not more than a person who exploited his image during life.[6]

Without doubt, Dr. King could have exploited his name and likeness during his lifetime. That this opportunity was not appealing to him does not mean that others have the right to use his name and likeness in ways he himself chose not to do. Nor does it strip his family and estate of the right to control, preserve and extend his status and memory and to prevent unauthorized exploitation thereof by others. Here, they seek to prevent the exploitation of his likeness in a manner they consider unflattering and unfitting. We cannot deny them this right merely because Dr. King chose not to exploit or commercialize himself during his lifetime.

Question 3 is answered in the negative, and therefore we need not answer question 4.

*Certified questions 1 and 2 answered in the affirmative, question 3 answered in the negative, and question 4 not answered.*

All the Justices concur, except WELTNER, J., who concurs specially.

38748. THE MARTIN LUTHER KING, JR. CENTER FOR SOCIAL CHANGE, INC., et al. v. AMERICAN HERITAGE PRODUCTS, INC., et al.

WELTNER, Justice, concurring specially.

I concur specially because, although this matter is one of certified questions, I believe that the complaint states a claim upon which relief can be granted. I disagree most decidedly with the substantive portion of the majority opinion, for reason that it generates more unsettling questions than it resolves.

---

5. On appeal of this case, the Second Circuit reversed, finding the law of California applicable, where, as noted above, the right of publicity is not inheritable. *Groucho Marx Productions, Inc. v. Day & Night Co.,* 689 F.2d 317 (2d Cir.1982).

6. Although the conclusion reached in answer to question 2 was based in part upon commercial considerations, and our answer to question 3 is based upon the absence of exploitation, the reasoning supporting the answer to question 3 also supports the answer to question 2.

In this opinion, we have taken the "right of privacy" as enumerated in *Pavesich, supra,* and added thereto a new thing, now called a "right of publicity." That seems to me to be more an exercise in verbal juxtaposition than a careful examination of legal issues and practical results.

At heart, the whole body of tort law is but an expression of what the community perceives to be the civil, as opposed to moral or ethical, responsibility of its members to each other. That concept changes with the cumulative experiences and assessments of succeeding generations, through constitutional, legislative, and judicial pronouncement. And well it should, for, in Thomas Jefferson's words, "Laws and institutions must go hand in hand with the progress of the human mind."

*Pavesich,* as example, found that it was contrary to good conscience (the conscience, that is, of the community as delineated and declared by this Court) that New England Life Insurance Company, for financial gain, might expropriate an aspect of the personality of Paolo Pavesich by the unauthorized publication of his photograph. That conduct did not meet community standards, as assayed by our Court in the year 1905. Because a remedy must need be provided, we became the first high court in the Republic to "discover" a new right—the right to privacy.

Justice Cobb wrote, at the outset: "The novelty of the complaint is no objection when an injury cognizable by law is shown to have been inflicted on the plaintiff. . . . This results from the application of the maxim *ubi jus ibi remedium,* which finds expression in our code, where it declared that 'For every right there shall be a remedy, and every court having jurisdiction of the one may, if necessary, frame the other.' Civil Code § 4929." 122 Ga. at 193–94, 50 S.E. 68. (Code Ann. § 3–105).

This maxim appears at the second page of his noted opinion. Twenty-four pages later, in concluding an exhaustive and learned examination, he wrote: "The conclusion reached by us seems to be so thoroughly in accord with natural justice, with the principles of the law of every civilized nation, and especially with the elastic principles of the common law, and so thoroughly in harmony with those principles as molded under the influence of American institutions, that it seems strange to us that not only four of the judges of one of the most distinguished and learned courts of the Union, but also lawyers of learning and ability, have found an insurmountable stumbling block in the path that leads to a recognition of a right which would give to persons like the plaintiff in this case, . . . redress for the legal wrong, or, what is by some of the law-writers called, the *outrage* perpetrated by the unauthorized use of their pictures for advertising purposes." (Emphasis added) 122 Ga. at 218–19, 50 S.E. 68.

Thus it is shown that, while our learned forefather on this Court embraces as the foundation of his opinion the maxim *ubi jus ibi remedium, jus* comes into being through a necessity for *remedium.* He has applied therefore, what is in reality the converse of his professed authority—a rule of *ubi remedium ibi jus!*

Our ancient maxim—"for every right a remedy"—is, in truth, stated hind part before. The *reality* of the judicial process is this: wherever there *ought* to be a remedy, the Court will declare a corresponding right.

*Pavesich* demonstrates this process beyond cavil. Our Court therefore found, as to Pavesich, that the company's conduct was unconscionable; that for it he should have his remedy; that because there must be a remedy, there must also be, in the interest of logical tidiness and Hofeldian system, a corresponding right. We named that right, necessarily induced by the determination to provide a remedy, the "right of privacy," just as Adam named the animals in the Garden. (That *Pavesich* is perhaps the most noted product of our Court in terms of nationally recognized precedent proves, again, the generative force which lies in the power to bestow the name).

There can be little difficulty in approaching this case in precisely the same manner. I believe we would correctly assess commu-

nity concepts of responsibility in declaring that the complaint alleges conduct on the part of the defendants which, if true, would be, simply put, unconscionable. Conduct which is unconscionable under all the facts and circumstances of a given case is conduct which demands remedy. Thus we are saved the rigors and toils and perils of creating some new "right" and then declaring that it, like some Cardiff Giant, has been there all the while, waiting to be unearthed.

I would, therefore, answer the questions of the United States Court of Appeals in this manner: "The complaint in this case states a claim upon which relief can be granted." The authority for this response is no new "right," but this ancient remedy: "An action for money had and received lies in all cases where another has received money which the plaintiff, *ex aequo et bono,* is entitled to recover and which the defendant is not entitled in good conscience to retain." *Fain v. Neal,* 97 Ga.App. 497, 498, 103 S.E.2d 437 (1958).

Why, then, this exercise?

Because in proclaiming this new "right of publicity," we have created an open-ended and ill-defined force which jeopardizes a right of unquestioned authenticity—free speech. It should be noted that our own constitutional provision, Art. I, Sec. I, Par. IV, Constitution of Georgia (Code Ann. § 2–104), traces its lineage to the first Constitution of our State, in 1777, antedating the First Amendment by fourteen years. Its language is plain and all-encompassing: "No law shall ever be passed to curtail, or restrain the liberty of speech, or of the press; any person may speak, write and publish his sentiments, on all subjects, being responsible for the abuse of that liberty." Its authority is firmly established. *Georgia Gazette Publishing Co. v. Ramsey,* 248 Ga. 528, 529, 284 S.E.2d 386 (1981).

But the majority says that the fabrication and commercial distribution of a likeness of Dr. King is not "speech," thereby removing the inquiry from the ambit of First Amendment or Free Speech inquiries. 250 Ga. at 138, 296 S.E.2d at 700. (Of the majority opinion.) [694 F.2d at 677].

To this conclusion I most vigorously dissent. When our Constitution declares that anyone may "speak, write and publish his sentiments, on all subjects" it does not confine that freedom exclusively to verbal expression. Human intercourse is such that ofttimes the most powerful of expressions involve no words at all, e.g., Jesus before Pilate; Thoreau in the Concord jail; King on the bridge at Selma.

Do not the statues of the Confederate soldiers which inhabit so many of our courthouse squares express the sentiments of those who raised them?

Are not the busts of former chief justices, stationed within the rotunda of this very courthouse, expressions of sentiments of gratitude and approval?

Is not the portrait of Dr. King which hangs in our Capitol an expression of sentiment?

Manifestly so.

If, then, a two-dimensional likeness in oil and canvas is an expression of sentiment, how can it be said that a three-dimensional likeness in plastic is *not*?

But, says the majority, our new right to publicity is violated only in cases involving financial gain. 250 Ga. at 142, 296 S.E.2d at 703. [694 F.2d at 680].

Did the sculptors of our Confederate soldiers, and of our chief justices, labor without gain? Was Dr. King's portraitist unpaid for his work?

If "financial gain" is to be the watershed of violation *vel non* of this new-found right, it cannot withstand scrutiny. It is rare, indeed, that any expression of sentiment beyond casual conversation is not somehow connected, directly or indirectly, to "financial gain." For example, a school child wins a $25 prize for the best essay on Dr. King's life. Is this "financial gain?" Must the child then account for the winnings?

The essay, because of its worth, is reprinted in a commercial publication. Must the publisher account?

The publication is sold on the newsstand. Must the vendor account?

The majority will say "free speech." Very well. The same child wins a $25 prize in the school art fair. His creation—a bust of Dr. King.

Must he account?

The local newspaper prints a photograph of the child and of his creation. Must it account?

The school commissions replicas of the bust to raise money for its library. Must it account?

UNICEF reproduces the bust on its Christmas cards. Must it account?

Finally, a purely commercial venture undertakes to market replicas of the bust under circumstances similar to those of this case. Must it account?

Obviously, the answers to the above questions will vary, and properly so, because the circumstances posited are vastly different. The dividing line, however, cannot be fixed upon the presence or absence of "financial gain." Rather, it must be grounded in the community's judgment of what, *ex aequo et bono,* is unconscionable.

Were it otherwise, this "right of publicity," fully extended, would eliminate scholarly research, historical analysis, and public comment, because food and shelter, and the financial gain it takes to provide them, are still essentials of human existence.

Were it otherwise, no newspaper might identify any person or any incident of his life without accounting to him for violation of his "right to publicity."

Were it otherwise, no author might refer to any event in history wherein his reference is identifiable to any individual (or his heirs!) without accounting for his royalties.

\* \* \*

A careful analysis of the right of free speech yields conclusions not inconsistent with the above. *All* speech is not "free," in the sense of being immune from all consequence.

Over the years our law has imposed and sustained restraints—criminal, equitable, and remedial—upon forms of speech which *inter alia* include: treason, pornography, inciting to riot, fighting words, defamation, criminal conspiracy and criminal solicitation, false official statements, and perjury.

It is undeniable that the acts controlled by these sanctions can be that of "speaking, writing, or publishing of sentiments." Yet, we have little difficulty in excluding proper cases from the privileged realm of "free speech" because *in each such instance* the calculable evil of its license plainly outweighs the potential evil of its prohibition.

As example, the community deems it "better" (and the courts so declare it) that treason be controlled than that an untrammeled free speech should give license to treasonable conduct.

Each lawful restraint finds its legitimacy, then, *not* because it is laid against some immutable rule (like the weights and measures of the Bureau of Standards) but because it is perceived that it would be irresponsible to the interest of the community—to the extent of being *unconscionable*—that such conduct go unrestrained.

The doctrine of unjust enrichment finds its genesis in such a reckoning. It can be applied to just such a matter as that before us. Were we to do so, we could avoid entering the quagmire of combining considerations of "right of privacy," "right of publicity," and considerations of *inter vivos* exploitation. We would also retain our Constitutional right of free speech uncluttered and uncompromised by these new impediments of indeterminate application.

And we could sanction relief *in this case* —where relief is plainly appropriate.

### SUPREME COURT OF THE STATE OF GEORGIA

CLERK'S OFFICE, ATLANTA

October 28, 1982

I hereby certify that the foregoing pages hereto attached contain a true and complete copy of the opinion of the Supreme Court of Georgia in the case therein stated, as appears from the original of file in this office.

Witness my signature and the seal of the said Court hereto affixed the day and year above written.

  /s/   Hazel E. Hallford, Deputy Clerk