**GRIDIRON.COM, INC., a Florida Corporation, Plaintiff,**

v.

**NATIONAL FOOTBALL LEAGUE, PLAYER'S ASSOCIATION, INC., a Virginia Corporation, and National Football League Players, Inc., a Virginia Corporation, Defendants.**

No. 99–6837–CIV.

United States District Court, S.D. Florida.

July 11, 2000.

Alexander Theodore Sarafoglu, Morgan Lewis & Bockius, Miami, FL, Keith Olin, Morgan Lewis & Bockius, Miami, FL, for Gridiron.com, Inc., a Florida, corporation.

Jillian Elisabeth Marcus, Weil Gotshal & Manges, Miami, FL, Valerie Greenberg Itkoff, Weil Gotshal & Manges, Miami, FL, Edward Soto, Weil Gotshal & Manges, Miami, FL, for National Football League Players Association, Inc., a Virginia Corporation.

Jillian Elisabeth Marcus, Weil Gotshal & Manges, Miami, FL, Valerie Greenberg Itkoff, Weil Gotshal & Manges, Miami, FL, Edward Soto, Weil Gotshal & Manges, Miami, FL, for National Football League Players, Inc., a Virginia Corporation.

## OMNIBUS ORDER

DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon:

1. Defendants', National Football League Players Association, Inc. ("NFLPA") and National Football League Players, Inc. Motion for Summary Judgment, filed herein on May 26, 2000;

2. Plaintiff's, Gridiron.com, Inc. Motion for Summary Judgment, filed herein on May 30, 2000;

3. Defendants' Motion for Leave to File an Amended Counterclaim Withdrawing Defendants' Claim for Monetary Damages, filed herein on July 5, 2000; and

4. Plaintiff's Unopposed Motion to Vacate Order, filed herein on July 7, 2000.

The Court has carefully reviewed the motions and is otherwise fully advised in the premises.

## I. BACKGROUND

Plaintiff operates a domain of Internet websites devoted to professional football. Defendant NFLPA is the recognized union for National Football League ("NFL") Players. NFL Players, Inc. is a *for-profit* subsidiary of the NFLPA, engaged in the business of licensing intellectual property rights of NFL Players.

This action revolves around Plaintiff's contracts with over one hundred and fifty (150) NFL players and whether these contracts and Plaintiff's website violate the NFL Players Contract and Group Licensing Assignment (GLA), signed by 97% of the players. The NFL Players Contract states in pertinent part: "Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on products that are sold at retail or used as promotional or premium items." The GLA states in pertinent part: "Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items."

Plaintiff received a "cease and desist" letter from the NFLPA, which stated that the website violated the aforementioned agreements. Plaintiff then filed this action for Declaratory Judgment, seeking this Court to find that their domain of websites does not violate Defendants' licensing rights. Defendants counterclaimed, seeking declaratory relief that the websites violate its licensing rights, damages for tortious interference with contracts and injunctive relief.

The Court notes that Plaintiff and Defendants have stated that there does not exist any genuine issues of material fact in dispute. Plaintiff filed this Motion for Summary Judgment, arguing that they are not infringing on the NFLPA's rights under the agreements, specifically that NFL Players have an individual right to their own image, the features of the websites do not fall within the definition of a group licensing program, and the content on the websites are protected by the First Amendment. Defendants file their Motion for Summary Judgment, arguing that NFL Players can assign their publicity rights and the website and Gridiron Player Agreements clearly violate Plaintiff's group licensing rights. Additionally, Defendants seek an injunction.[1]

## II. DISCUSSION

### A. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and any doubts in this regard should be resolved against the moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548.

---

1. The Court notes that Defendant filed included in the counterclaim a claim for tortious interference, but withdrew the claim in their July 6, 2000 Motion.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric . Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the plain language of Fed.R.Civ.P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### B. License Infringement

 The contract in dispute is the GLA between the NFLPA and NFL Players. The contract was drafted in New York. Under New York Law, when interpreting a contract, "the intent of the parties governs." *Forbes v. Cendant Corporation*, 205 F.3d 1322, 2000 WL 232069 (2nd Cir. 2000); *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dep't 1990). The intent is inferred from the plain meaning of the language employed in the contract. *Id.; See Andy Warhol Found. For the Visual Arts., Inc. v. Federal Ins. Co.*, 189 F.3d 208, 215 (2d Cir.1999); *Air Products and Chemicals, Inc. v. The Louisiana Land and Exploration Company*, 806 F.2d 1524 (11th Cir.1986).

This action hinges on whether Plaintiff's websites and contracts with NFL Players violates the Players' existing contracts with Defendants, which states in pertinent part: "Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on products that are sold at retail or used as promotional or premium items." Plaintiff's websites utilize the images of over 150 NFL players. NFL Players who have signed the NFLP and GLA licensing agreements, are also under a contractual agreement with Gridiron. The Gridiron Player Agreement states in pertinent part:

(a) any and all forms of electronic programming and services including, without limitation, the Website and any other online, Internet and web-based interactive programming, broadcasts or services (e.g., online screens, web pages, chat sessions, bulletin boards and mailboxes), but excluding television and radio, whether accessed by computer, cable or satellite television, or by other forms of electronic distribution now known or hereafter developed ("Gridiron Services"); (b) any and all products to be sold by Gridiron in, on, through or from any form of electronic distribution (excluding television and radio) now known hereafter developed ("Gridiron Products"); and (c) any and all forms of advertising, promotion and public relations in any and all media (including television and radio) for the purpose of advertising and/or promoting the Gridiron Services or the Gridiron Products.

Soto Affidavit, Exhibit 4. In exchange for the Players entering into Gridiron's Player Agreement, Plaintiff made payments of cash and warrants to buy stock in Plaintiff's parent company. Soto Affidavit.

 Plaintiff argues that the word product in the GLA is ambiguous, and should be interpreted against the drafter. The determination of whether a term is ambiguous is a question of law to be an-

swered by the Court. *Pantone, Inc. v. Esselte Letraset, Ltd.*, 878 F.2d 601, 605 (2nd Cir.1989). The contract that the parties wish for the Court to interpret is the NFLPA's GLA. This contract is between the NFLPA and the NFL Players. The NFLPA is the exclusive representative of the players, with the authority to bind them. *See* Allen Affidavit at ¶ 10. Players can choose not to be bound by the provisions of the GLA, by crossing out paragraph 4(b) of the standard NFL Player Contract before signing. *Id.* at ¶ 15. Defendant NFLPA and the NFL Players were involved in collective bargaining agreements ("CBA"), and the word "product" was used in the CBA's to include products of an electronic type, including Internet websites. *Id.* at ¶ 14. The NFLPA has the authority to bind the members of its union, and Courts have consistently held that a union's interpretation of the collectively bargained provisions is determinative. *Wood v. National Basketball Association*, 809 F.2d 954 (2nd Cir.1987); *Bagsby v. Lewis Bros., Inc.*, 820 F.2d 799, 802 (6th Cir.1987). This is evidenced by Defendant's repeated licensing of as products other websites, video games, and fantasy football games. Allen Affidavit at ¶ 25–39. The Court notes that Plaintiff also seeks to have this Court question the interpretation of a contract that they are neither a party, nor a direct third-party beneficiary.

Plaintiff's websites consist of a menu that leads directly to information and images of hundreds of NFL players. *See* Soto Affidavit, Exhibit 1. Each of the interconnected Player web pages also contains the Gridiron name and logo. *Id.* Plaintiff's websites utilize a fantasy football game which allows a person on the websites to select and trade any of the NFL players. *Id.*

▇ Plaintiff had also planned to utilize the websites to open a "Pro Shop" which would include player endorsed memorabilia, apparel, novelty items, signed footballs, signed pictures, photographs of players, replica jerseys, helmets and artwork. Soto Affidavit, Exhibit 5.[2] The websites display third-party advertising, in which third party advertisers are, "willing to pay top dollar for the opportunity to be affiliated with you as a professional football player." Soto Affidavit, Exhibit 2.

It is therefore undisputed that Plaintiff utilizes a total of six or more NFL Player Images since the websites contain direct links of almost every player in the NFL, and over one hundred and fifty (150) of those players have contracted with Plaintiff. The website was created by aggregating individual player websites and linking them together. Additionally, all of the players are included in the fantasy football game. The links contain the symbol and logo of Gridiron on the screen. Gridiron has promoted the website as a whole, and has not promoted individual player web pages. Soto Affidavit, Exhibit 5, Dobbins Transcript at 80.

Plaintiff is utilizing six or more player images in conjunction with or on products. Plaintiff has stated: "The NFL players have a well-respected promotional draw and many companies desire to associate that draw with their product or service." Soto Affidavit, Exhibit 2. "Advertisers are expecting to reap the benefit of appearing in one of the premier online sports sites, as well as associating themselves with the NFL's players." *Id.* "The Company's greatest attribute of its Gridiron.com web sites is the affiliation with the NFL football players. It is believed this affiliation will provide the Company with the leverage to persuade advertisers to willingly pay premium prices for the placement of advertising on the 'official' web sites of the

---

**2.** The Court notes that Plaintiff has represented that it "does not now, never has, and does not intend to sell or offer any merchandise, memorabilia or other products on its websites at all." Plaintiff's Response at 2. In regard to

a claim for injunctive relief, a party cannot rest on the assertion that it will not perform a certain action. *See United States v. Oregon Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

NFL football players." *Id.* "The Company believes that by having the players directly associated with the Gridiron.com web sites, the memorabilia offered will have a greater perceived value to the customer since the fear of purchasing a fraudulent item is eliminated." *Id.*

Defendants argue that in addition to using the players' images in conjunction with products, Plaintiff is using the images on products sold at retail or used as promotional or premium items, most significantly, the website. In a June 2, 1999 letter, Scott Dobbins, Gridiron's founder, CEO and President, stated: "[w]e feel that we are offering the best Internet product for NFL players and that we are well equipped to remain far ahead of any current or future competitors." Allen Affidavit, Exhibit P. In describing the work done on the websites, co-founder of Gridiron stated that he "wasn't happy with the product." Deignan Transcript at 74. In his transcript, Deignan continually refers to the websites as a product. *Id.* Additionally, the products include the third party advertised products on the websites.

Plaintiff argues that the websites are not a product, and they have not sold any products on the websites (the Pro Shop). Plaintiff cites *James v. Meow Media, Inc., Radio Channel Networks, Inc. v. Broadcast.Com, Inc.,* and *Maritz v. Cybergold* to support its argument. In *James,* the Court was dealing with a strict liability claim, and found that "[w]hile computer codes and programs are construed as 'tangible property' for tax purposes and as 'goods' for UCC purposes, these classifications do not indicate that intangible thoughts, ideas and messages contained in computer video games, movies, or internet materials should be treated as products for purposes of strict liability." *James v. Meow Media, Inc.,* 90 F.Supp.2d 798, 810 (W.D.Ky.2000). Although this case is not related to this action, in that it describes tangible products in the context of strict liability, Gridiron.com is not similar to a book, because it does not contain intangible thoughts, ideas and messages. The websites are a product that aggregates information on football players and organizes the information for easy access. In *Radio Channel,* the Court, in defining certain functions of the internet as it related to violations of the Lanham Act, stated that "the use of search engines to navigate the World Wide Web multiplies the possible associations between words and goods or services that consumers might take advantage of when they go about locating particular sources." *Radio Channel Networks, Inc. v. Broadcast.Com, Inc.,* 1999 WL 124455 (S.D.N.Y.). Additionally, the Court refers to the service provided by Radio Channel's website, *Id.* at * 1. The Court in *Maritz* characterized the Plaintiff's website in their action, as a service. *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328, 1330 (E.D.Mo.1996). The term service was only used while setting out the facts. In the *Radio* and *Maritz* cases, the Courts did not hold that a website is not a product, nor did the Courts imply that proposition. Defendant cites to several cases which referred to websites as products in the same vein. *See Perfect 10, Inc. v. Talisman Communications, Inc.,* 2000 WL 364813 at *1 (C.D.Cal.); *OBH, Inc. v. Spotlight,* 86 F.Supp.2d 176, 179 (W.D.N.Y.2000).

Plaintiff contracted with, and used more than six players images in conjunction with products or on products which were sold at retail or used as promotional or premium items. It is apparent that Plaintiff utilizes six or more images in conjunction with its websites. Plaintiff uses these players to promote their websites in order to solicit third party advertisements. The websites, in and of themselves, are products, based on certain comments made by Plaintiff, the interpretation of the GLA by the NFLPA and the NFL Players, and by the plain meaning of the term describing the aggregation of the Players' sites and the fantasy football game. The cases cited by Plaintiff do not stand for the proposition that a website is not a product.

"It has been held that the exclusive licensee of the right to exploit a celebrity's name, likeness or personality has a proprietary interest (a 'right of publicity'), assignable in gross to the extent permitted under the original licensing agreement with the celebrity." *Uhlaender v. Henricksen,* 316 F.Supp. 1277, 1281 (D.Minn. 1970); *Haelan Laboratories, Inc. v. Topps Chewing Gum,* 202 F.2d 866 (2d Cir.1953), *cert. denied* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). Defendants have an exclusive licensing agreement with 97% of the NFL Players. The licensing agreement has assigned the Players rights to Defendants, and Plaintiff's contractual agreements with the Players violates Defendants' proprietary rights in six or more NFL Players' images.

### C. Freedom of Speech

Plaintiff argues that the websites are protected by the First Amendment and the NFLPA is holding part of each individual Player's right to publicity. "The right of publicity may be defined as a celebrity's right to the exclusive use of his or her name and likeness." *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.,* 694 F.2d 674, 676 (11th Cir.1983). Plaintiff contends that the GLA does not prevent Gridiron from publishing its domain of websites. However, "[t]he right of publicity is assignable during the life of the celebrity, for without this characteristic, full commercial exploitation of one's name and likeness is practically impossible." *Id.* at 680. The right to publicity is a legally protected, transferable interest. *First Victoria National Bank v. U.S.,* 620 F.2d 1096 (5th Cir.1980). 97% of the NFL Players have assigned their publicity rights to Defendants. Plaintiff uses declarations from seven NFL Players, stating that they did not know the NFLPA agreements covered the Internet. However, it is undisputed that Plaintiff made several representations to these same Players that the Agreements they signed with Plaintiff would not violate the agreements with the NFLPA. *See* Allen Deposition, Exhibit 3.

Plaintiff continues to argue that their speech is similar to that of novels, movies, music, magazines and newspapers, giving rise to heightened constitutional protections, not generally accorded merchandise, due to the expression of ideas and opinions. *See Hicks v. Casablanca Records,* 464 F.Supp. 426, 432 (S.D.N.Y. 1978). However, Plaintiff pays NFL Players to endorse their website and to help attract third party advertisements. The Right to Privacy is limited to the extent reasonably required to convey the news to the public. *Hoffman v. Capital Cities/ABC, Inc.,* 33 F.Supp.2d 867, 872 (C.D.Cal.1999); *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Plaintiff seeks to utilize the players it contracts with to use their images and have them perform functions that go way beyond merely conveying the news. Therefore, Plaintiff's claim that the NFLPA's licences with the players violates the First Amendment is flawed. Plaintiff sees its competition as other Internet companies and merchandise sellers, not sports magazines. Soto Affidavit, Exhibit 5; Dobbins Transcript at 183, 184.

Defendants argue that Plaintiff's actions belie their First Amendment argument. Plaintiff actively sought out and obtained over 150 NFL Player's publicity rights, and now argues that the information the websites produce are entitled to Free Speech protection. Plaintiff's argument is not persuasive.

### D. Injunction

Defendants seek an injunction, barring Plaintiff from violating the NFLPA's Licensing Agreements; barring Plaintiff's use of six or more Player images and barring Plaintiff from entering into Agreements with Players which transfer the Players' licensing rights to Plaintiff. For Defendants to be successful in the request for injunctive relief, they must demonstrate: 1) Actual success on the merits; 2) the permanent injunction is necessary to prevent irreparable injury; 3)

the threatened injury outweighs the harm the permanent injunction would inflict on the non-movant; and 4) the permanent injunction would serve the public interest. *A Choice for Women v. Robert Butterworth,* 54 F.Supp.2d 1148, 1154 (S.D.Fla. 1998); *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir.1995).

This Court has found that Defendants' existing Licensing Agreements with NFL Players have been violated by Plaintiff's actions. Therefore, Defendants have demonstrated actual success on the merits of their claim, thus satisfying the first prong.

Defendants have shown that they will suffer irreparable injury from Plaintiff's conduct. Irreparable harm can be found through loss of advertising revenue and goodwill. *CBS Inc. v. PrimeTime 24 Joint Venture,* 9 F.Supp.2d 1333 (S.D.Fla. 1998). Defendants have demonstrated that Plaintiff's website is damaging Defendants' goodwill by causing potential and actual conflicts with already existing licensees for Internet use and for products similar to those advertised by Plaintiff. Allen Affidavit at ¶ 50. Defendants are also losing licensing revenues from potential licensees in an amount that is difficult to ascertain because Plaintiff's website is diverting business away from them. *See Wilkinson v. Manpower, Inc.,* 531 F.2d 712 (5th Cir.1976). Plaintiff has usurped the goodwill associated with, and the commercial value of Defendants' exclusive licensing rights, which have been ongoing, and carefully developed and guarded with investment of significant time, energy and money over many years. Allen Affidavit at ¶ 50.

Defendants must demonstrate that the threatened injury outweighs the harm a permanent injunction would inflict on Plaintiff. Plaintiff argues that an injunction would severely impair its business. However, in light of this Court's findings, Plaintiff will not suffer harm to a legitimate interest. *See MediaOne of Delaware, Inc. v. E & A Beepers & Cellulars,* 43 F.Supp.2d 1348, 1355 (S.D.Fla.1998). This Court will merely enjoin conduct that violates an existing licensing agreement which Defendants have nurtured and maintained for many years. The balancing of harm favors Defendants.

The final factor involves whether the permanent injunction will serve the public interest. The public interest is well served when the Court protects those with valid, valuable exclusive rights of publicity and protects those with contractual relations. Additionally, it would be unfair to allow a party to infringe on another's exclusive licencing rights to a celebrity, when that agreement was freely made.

### III. CONCLUSION

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment is hereby **GRANTED;**

2. Plaintiff's Motion for Summary Judgment is hereby **DENIED;**

3. Defendants' Motion for Leave to File an Amended Counterclaim Withdrawing Defendants' Claim for Monetary Damages is hereby **GRANTED.** Defendants' claim for Tortious Interference is hereby Dismissed, with prejudice;

4. Plaintiff's Unopposed Motion to Vacate Order is hereby **GRANTED.** The Order to Compel, dated June 29, 2000, shall be vacated;

5. Plaintiff's use of six or more Player images and the Gridiron Player Agreements violate NFLPA's exclusive group licensing rights;

6. Plaintiff is permanently enjoined from using the images of six or more Players;

7. Plaintiff is permanent enjoined from entering into Gridiron Player Agreements with Players or taking any other action in

violation of NFLPA's exclusive licensing rights;

8. This Order does not pertain to Gridiron's Agreements with Players who chose not to assign their exclusive rights to NFLPA;

9. The above styled action is hereby Dismissed, with prejudice;

10. The Clerk is directed to deny all pending motions as moot; and

11. This Case is Closed.