[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16148

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-00421-CV-TWT-1

MAUREEN TOFFOLONI,
as Administrator and Personal Representative
of the Estate of Nance E. Benoit,

Plaintiff-Appellant,

versus

LFP PUBLISHING GROUP, LLC,
d.b.a. Hustler Magazine,
MARK SAMANSKY,
an individual,
DEFENDANTS X, Y, AND Z,
other distributors and sellers
of Hustler Magazine,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 25, 2009)

Before WILSON and ANDERSON, Circuit Judges, and GOLDBERG,[*] Judge.

WILSON, Circuit Judge:

This case involves the newsworthiness exception to the Georgia state law "right of publicity," which arises out of the constitutional right to privacy. The district court found that LFP Publishing Group, LLC's ("LFP") publication of twenty year old nude photographs of Nancy Benoit fell squarely within the newsworthiness exception. We reverse.

## A.    Background

Maureen Toffoloni is the mother and the administrator of the estate of Nancy Benoit. Benoit and her son, both Georgia residents, were murdered by her husband, Christopher Benoit, in June 2007. Christopher Benoit then committed suicide. Prior to her death, Benoit was a model and professional woman wrestler. Christopher Benoit was a well-known professional wrestler. Their deaths garnered a great deal of domestic and international media attention.

Approximately twenty years before her death, Benoit posed nude for photographer Mark Samansky, who took both photographs and a video of her. Toffoloni alleges that, immediately after the shoot, her daughter asked Samansky to destroy the photographs and video and believed that Samansky had destroyed

---

[*]Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

2

them.  However, Samansky kept the video, from which he extracted nude and partially nude photographic stills of Benoit.  Samansky conveyed the photographic stills to LFP, which published them in the March 2008 issue of *Hustler* magazine.

In February 2008, Toffoloni brought suit against LFP in Georgia state court, seeking to enjoin the publication of the photographs and seeking damages for violation of Benoit's right of publicity.  LFP removed the case to the United States District Court for the Northern District of Georgia.  On October 6, 2008, the district court granted LFP's motion to dismiss for failure to state a claim, concluding that "there is no dispute that Ms. Benoit's death was a 'legitimate matter of public interest and concern.'  Therefore the publication of Ms. Benoit's nude photographs cannot be described as a mere commercial benefit for [LFP] - although [LFP] (like nearly all journalistic outlets) no doubt seeks to profit from its publications." *Toffoloni v. LFP Publ'g Grp.*, No. 1:08-CV-421-TWT, 2008 U.S. Dist. LEXIS 82287, at *6 (N.D. Ga. 2008).  Toffoloni appealed to the United States Court of Appeals for the Eleventh Circuit.

## B.    The Right of Publicity Under Georgia Law

Georgia recognizes a right of publicity to protect against "the appropriation of another's name and likeness . . . without consent and for the financial gain of the appropriator . . . whether the person whose name and likeness is used is a private

citizen, entertainer, or . . . a public figure who is not a public official." *Martin Luther King, Jr. Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc.*, 296 S.E.2d 697, 703 (Ga. 1982). "The right of publicity may be defined as [an individual's] right to the exclusive use of his or her name and likeness." *Id*. at 700 (citation omitted). Violation of the right of publicity is a state tort. *Id*. at 703. *See also Alonso v. Parfet*, 325 S.E.2d 152, 153 (Ga. 1985) ("The courts in this state have long recognized that one who makes an unsanctioned appropriation of another's name or likeness for his own benefit may be liable to that person in tort.") (citation omitted).

The right of publicity grew out of a long-standing recognition of the right to privacy under Georgia law. *See Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 69-81 (Ga. 1905). Rooted in the right to privacy, the right of publicity is also characterized by an economic concern that individuals be allowed to control the use of their image in order to maximize the profit they can receive from its publication. We will first discuss the privacy right underpinnings of the right of publicity and then turn to its economic element.

**I.      The Right to Privacy Underpinning the Right of Publicity**

As the Supreme Court of Georgia has explained, "to each individual member of society there are matters private, and there are matters public so far as the

4

individual is concerned." *Pavesich*, 50 S.E. at 69. "All will admit that the individual who desires to live a life of seclusion can not be compelled, against his consent, to exhibit his person in any public place, unless such exhibition is demanded by the law of the land." *Id.* at 70. Thus, "[t]he right of privacy within certain limits is a right derived from natural law, recognized by the principles of municipal law, and guaranteed to persons in [Georgia] by the constitutions of the United States and of the State of Georgia, in those provisions which declare that no person shall be deprived of liberty except by due process of law." *Id.* at 71.

Furthermore, "[o]ne who desires to live a life of partial seclusion has a right to choose the times, places, and manner in which and at which he will submit himself to the public gaze." *Id.* at 70. "The right to withdraw from the public gaze at such times as a person may see fit, when his presence in public is not demanded by any rule of law is also embraced within the right of personal liberty." *Id.* Importantly, the Supreme Court of Georgia has specifically held that, except as required by law, "the body of a person can not be put on exhibition at any time or at any place without his consent." *Id.*

Concern about the publication of private photographs of individuals without their consent fueled Samuel Warren's and Justice Louis Brandeis' famous article, "The Right to Privacy," which was substantially relied upon by the Supreme Court

5

of Georgia in *Pavesich*, when the court first recognized the right to privacy. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 195 (1890); *Pavesich*, 50 S.E. at 74-75. Warren and Brandeis maintained as follows:

> Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right "to be let alone." Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that "what is whispered in the closet shall be proclaimed from the house-tops". . . . [t]he law must afford some remedy for the unauthorized circulation of portraits of private persons. . . .

Warren & Brandeis, 4 HARV. L. REV. at 195. Relying on Warren and Brandeis, the Supreme Court of Georgia sought to protect individuals from exhibition against their will by recognizing the right to privacy.

The tort of invasion of privacy protects the right "to be free from unwarranted publicity, . . . or the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs *with which the public had no legitimate concern*." *Gouldman-Taber Pontiac, Inc. v. Zerbst*, 100 S.E.2d 881, 882 (Ga. 1957) (emphasis added) (internal quotation marks, citation, and alterations omitted). From this right to be free of the public's illegitimate gaze, Georgia extrapolated a right of publicity– a right to control if, when, and under

6

what circumstances one's image is made public and subject to scrutiny.

Georgia first recognized the right of publicity in *Cabaniss v. Hipsley*, 151 S.E.2d 496 (Ga. Ct. App. 1966). The court held that the plaintiff, who was an exotic dancer, could recover from the Atlanta Playboy Club for its unauthorized use of her photograph in an entertainment magazine advertising the club. The court explained that "[u]nlike intrusion, disclosure, or false light, appropriation does not require the invasion of something secret, secluded or private pertaining to plaintiff, nor does it involve falsity. It consists of the appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness. . . . The interest protected . . . is not so much a mental as a proprietary one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity." *Id.* at 503-4 (internal quotation marks and citations omitted). Since the right of publicity is a "proprietary" right, "the measure of damages is the value of the use of the appropriated publicity." *Martin Luther King*, 296 S.E.2d at 703.

Subsequent to *Cabaniss*, the Georgia courts have expanded the right of publicity to "recognize[] the rights of private citizens, as well as entertainers, not to have their names and photographs used for the financial gain of the user without their consent, where such use is not authorized as an exercise of freedom of the press." *Id.* (citations omitted). Additionally, the Supreme Court of Georgia held

7

"that the right of publicity survives the death of its owner and is inheritable and devisable." *Id.* at 705.

The Restatement (Second) of Torts, however, tempers the right of publicity, providing that:

> No one has the right to object merely because his name or his appearance is brought before the public, *since neither is in any way a private matter, and both are open to public observation*. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right to privacy is invaded.

RESTATEMENT (SECOND) OF TORTS § 652C cmt. d (1977) (emphasis added). Thus, the Restatement clarifies that the right of publicity does not attach to that which is "open to public observation." *Id.* Accordingly, the right of publicity must attach to that which is not open to public observation and is appropriated for the commercial benefit of another.[1]

## II. Economic Concerns Inherent in the Right of Publicity

The Supreme Court of the United States has underscored the economic

---

[1] "It is not the manner in which information has been obtained that determines whether it is public or private. . . . The offense with which we are here involved is not the intrusion by means of which information is obtained; it is the publicizing of that which is private in character. The question, then, is whether the information disclosed was public rather than private – whether it was generally known and, if not, whether the disclosure . . . can be said to have been to the public at large." *Virgil v. Time, Inc.*, 527 F.2d 1122, 1126 (9th Cir. 1975) (citation omitted).

concern inherent in recognition of a right of publicity. The Supreme Court considered the right of publicity in a case where a broadcasting company transmitted an entertainer's entire performance without his permission, essentially appropriating the entertainer's potential viewing audience. The Court held:

> [t]he rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay.

*Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576, 97 S. Ct. 2849, 2857 (1977) (internal quotation marks and citation omitted). Thus, when a media outlet appropriates "some aspect" of an individual "that would have market value and for which he would normally pay," without that individual's permission, the media outlet is subject to damages in a tort suit for violation of the right of publicity. *Id.*

## C. The "Newsworthiness" Exception to the Right of Publicity

The right to privacy and corresponding right of publicity are necessarily in tension with the First Amendment's protection of freedom of speech and of the press. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." U.S. CONST. amend. I. Additionally, the Georgia state constitution provides that "[e]very person may speak, write, and publish sentiments on all subjects but shall be responsible for the

9

abuse of that liberty."  GA. CONST. art. I, § I, para. V.  As the Supreme Court of Georgia has explained, "[t]he right preserved and guaranteed against invasion by the constitution is therefore the right to utter, to write, and to print one's sentiments, subject only to the limitation that in so doing he shall not be guilty of an abuse of this privilege by invading the legal rights of others."  *Pavesich*, 50 S.E. at 73.

Both the rights to freedom of speech and freedom of the press, as guaranteed by the First Amendment, and the right to privacy, as guaranteed by the Due Process Clause, are fundamental constitutional rights.  The Constitution directs no hierarchy between them.  Thus, courts are required to engage in a fact-sensitive balancing, with an eye toward that which is reasonable and that which resonates with our community morals, in order to protect the Constitution as a whole.

In order to navigate between the competing constitutionally protected rights of privacy and publicity and the rights of freedom of speech and of the press, the Georgia courts have adopted a "newsworthiness" exception to the right of publicity.  The  Supreme Court of Georgia has held that "where an incident is a matter of public interest, or the subject matter of a public investigation, a publication in connection therewith can be a violation of no one's legal right of privacy."  *Waters v. Fleetwood*, 91 S.E.2d 344, 348 (Ga. 1956).

10

The Georgia Supreme Court has further distinguished commercial use from newsworthy use, stating that "[t]here is in the publication of one's picture for advertising purposes not the slightest semblance of an expression of an idea, a thought, or an opinion, within the meaning of the constitutional provision which guarantees to a person the right to publish his sentiments on any subject." *Pavesich*, 50 S.E. at 80. Accordingly, where a publisher may be precluded by the right of publicity from publishing one's image for purely financial gain, as in an advertisement, where the publication is newsworthy, the right of publicity gives way to freedom of the press.[2]

## D.    Analysis of LFP's Publication of the Nude Photographs

This case requires us to consider the nature and extent of the newsworthiness exception to the right of publicity. "It is in the determination of newsworthiness – in  deciding whether published or broadcast material is of legitimate public concern

---

[2]The Supreme Court of California has identified a number of factors to be considered when a court determines whether a particular fact qualifies as newsworthy.

> Among the factors to consider are the depth of the intrusion into the plaintiff's private affairs, the extent to which the plaintiff voluntarily pushed himself into a position of public notoriety . . . and whether the information is a matter of public record. . . . The weighing process continues in light of the circumstances prevailing at the time of publication.

*Forsher v. Bugliosi*, 608 P.2d 716, 727 (Cal. 1980). We agree that each of these factors is potentially relevant to determining whether the published fact could reasonably be considered newsworthy.

11

– that courts must struggle most directly to accommodate the conflicting interests of individual privacy and press freedom." *Shulman v. Group W Prods., Inc.*, 955 P.2d 469, 479 (Cal. 1998). Toffoloni argues that she should be allowed to sue for damages incident to the publication of nude pictures of her deceased daughter because those photographs were published against her express direction and were violative of her daughter's right of publicity. LFP responds that it published an article on the life, career, and tragic death of Benoit, which "includes comment on the modest beginnings of Ms. Benoit's career, and is accompanied by images of Ms. Benoit from that time." LFP argues that the article and related images are of substantial public interest and are therefore newsworthy.

Our resolution of this case commands an intensive review of both the relationship between the published photographs and the corresponding article, as well as the relationship between the published photographs and the incident of public concern – Benoit's murder. We review the district court's grant of LFP's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), *de novo*. *Berman v. Blount Parrish & Co.*, 525 F.3d 1057, 1057 (11th Cir. 2008).

## I. The Incidental Relationship Between the Article and Photographs

First, it seems clear that had LFP published the nude photographs of Benoit

by themselves– i.e., without a corresponding news article– the publication would not qualify within the newsworthiness exception. The fact of Benoit's nudity is not in and of itself newsworthy. "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information." *Gautier v. Pro-Football, Inc.*, 107 N.E.2d 485, 488 (N.Y. 1952) (citations omitted). The nude photographs "impart[] no information to the reading public." *McCabe v. Vill. Voice, Inc.*, 550 F. Supp. 525, 530 (E.D. Pa. 1982). The photographs, by themselves, serve no "legitimate purpose of disseminating news . . . and needlessly expose[] aspects of the plaintiff's private life to the public." *Id.* (internal quotation marks and citations omitted). Indeed, people are nude every day, and the news media does not typically find the occurrence worth reporting.

Here, however, LFP published the photographs alongside a biographical piece on Benoit's career. The biographical piece, in and of itself, certainly falls within the newsworthiness exception. *See generally Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S. Ct. 876 (1988). The question before us is whether a brief biographical piece can ratchet otherwise protected, personal photographs into the newsworthiness exception.

13

As the Second Circuit has held, "it is appropriate for a court to consider whether the public interest aspect of the publication is merely incidental to its commercial purpose." *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87-88 (2d Cir. 1989) (internal quotation marks and citation omitted). Although LFP argues that the photographs were illustrative of the substantive, biographical article included in *Hustler*, our review of the publication demonstrates that such is not the case. These photographs were not incidental to the article. Rather, the article was incidental to the photographs.

The magazine cover advertises "WRESTLER CHRIS BENOIT'S MURDERED WIFE NUDE." The table of contents lists "NANCY BENOIT Exclusive Nude Pics of Wrestler's Doomed Wife." Neither the cover nor the table of contents makes any reference to the accompanying article. The article is entitled "NANCY BENOIT Au Naturel: The long-lost images of wrestler Chris Benoit's doomed wife." The title and page frame, which reads "EXCLUSIVE PICS! EXCLUSIVE PICS!," comprise about one-third of the first page. A second third of the page is devoted to two nude photographs of Benoit. The final third of the page discusses Benoit's murder and her nude photo shoot, twice referencing her brief desire to be a model. The second page of the article is entirely devoted to photographs, displaying eight additional photographs of Benoit. The heart of this

14

article was the publication of nude photographs– not the corresponding biography.

The *Martin Luther King, Jr., Center for Social Change* case is particularly relevant here. In that case, the Supreme Court of Georgia answered several certified questions about the existence and extent of the right of publicity under Georgia law in the context of whether the Martin Luther King, Jr., Center for Social Change, Inc. and Coretta Scott King, as administratrix of Dr. King's estate, possessed a right of publicity in Dr. King's image. *Martin Luther King*, 296 S.E.2d at 699. The plaintiffs argued that their right of publicity was violated when B&S Sales manufactured and sold a plastic bust of Dr. King without their permission. Although the opinion does not deal expressly with the "newsworthiness" exception to the right of publicity, the Supreme Court of Georgia specifically notes that B&S Sales offered a free biographical booklet detailing "the life of Dr. King entitled 'A Tribute to Dr. Martin Luther King, Jr.,'" alongside the bust. *Id.* at 698. The court did not conclude that the booklet rendered Dr. King's image, in and of itself, newsworthy. Rather, the opinion treats the existence of the booklet as irrelevant. The booklet was merely incidental to the bust. Without more, Dr. King's estate's right of publicity in his image could trump freedom of speech and the press.

We are convinced that the Supreme Court of Georgia would find similarly

15

here. LFP's brief biography of Benoit's life, even with its reference to her youthful pursuit of modeling, is merely incidental to its publication of her nude photographs. Therefore, the biographical piece cannot suffice to render the nude photographs newsworthy.

## II. Relationship of the Photographs to the Incident of Public Concern

Furthermore, we are convinced that the nude photographs are not connected to the incident of public concern. LFP would have us rule that someone's notorious death constitutes a carte blanche for the publication of any and all images of that person during his or her life, regardless of whether those images were intentionally kept private and regardless of whether those images are of any relation to the incident currently of public concern. We disagree.

The Georgia courts have never held, nor do we believe that they would hold, that if one is the victim of an infamous murder, one's entire life is rendered the legitimate subject of public scrutiny. Such a ruling would eviscerate the Georgia right of publicity, allowing the exception to swallow the rule. Rather, the Georgia courts have consistently indicated that there are timeliness or relatedness boundaries that circumscribe the breadth of public scrutiny to the incident of public interest.

For example, in *Tucker v. News Publishing Company*, 397 S.E.2d 499 (Ga.

16

Ct. App. 1990), the court recognized that "through no fault of his own, [the] appellant [who had been attacked] became the object of public interest." *Id.* at 500 (internal quotation mark omitted). The attack itself "necessarily became a matter of legal investigation and the subject matter of public records." *Id.* Thus, the court concluded "*[d]uring the pendency and continuation of the investigation*, and until such time as the perpetrator[s] of the crime may be apprehended and brought to justice under the rules of our society, the matter will continue to be one of public interest, and the dissemination of information pertaining thereto would not amount to a violation of [appellant's] right of privacy." *Id.* (internal quotation marks and citation omitted) (emphasis added). The court expressly envisioned outside boundaries to the realm of public scrutiny: "the matter [of] public interest" and the "time [that] the perpetrator[s] of the crime may be apprehended and brought to justice. . . ." *Id.* (internal quotation marks and citation omitted).

Similarly, in *Ramsey v. Georgia Gazette Publishing Company*, 297 S.E.2d 94, 96 (Ga. Ct. App. 1982), the court recognized that the "plaintiff has, albeit unwillingly, become an actor in a public drama." As such, "[d]issemination of information *pertaining to this drama* is no violation of the plaintiff's right of privacy." *Id.* (emphasis added). Correspondingly, we conclude that the Georgia courts would find that dissemination of information that does not pertain to the

17

"drama" at hand *may* violate an individual's right of privacy. Although the Georgia courts have not said that public scrutiny is circumscribed solely to the details of the newsworthy event itself, the Georgia courts have required reasonable timeliness and relatedness boundaries.

When determining where such boundaries should be drawn, we are guided by the commentary on the permissible publicity of private facts in the Restatement (Second) of Torts. The Restatement recognizes that, although an individual may be rendered subject to public scrutiny by some newsworthy event, "[t]he extent of the authority to make public private facts is not . . . unlimited." RESTATEMENT (SECOND) OF TORTS § 652D cmt. h. The Restatement concludes that even public figures, like actresses, may be "entitled" to keep private "some intimate details . . . such as sexual relations. . . ." *Id.* "The line is to be drawn when the publicity ceases to be the giving of information to which the public is *entitled*, and becomes a morbid and sensational prying into private lives for its own sake, *with which a reasonable member of the public, with decent standards, would say that he had no concern*." *Id.* (emphasis added). The Restatement expounds that "[t]he limitations . . . are those of common decency, having due regard to the freedom of the press and its reasonable leeway to choose what it will tell the public, but also due regard to the feelings of the individual and the harm that will be done to him by the

18

exposure." *Id.* Furthermore, "*[s]ome reasonable proportion is also to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given*." *Id.* (emphasis added).

Here, the published nude photographs were in no conceivable way related to the "incident of public concern" or current "drama"– Benoit's death. The district court erred in its reliance upon *Waters v. Fleetwood*, 91 S.E.2d 344 (Ga. 1956), in which the Supreme Court of Georgia "found no actionable right when a defendant featured gratuitous, sensational photographs alongside a legitimate news article" to direct the dismissal of Toffoloni's claim. *Toffoloni*, No. 1:08-CV-421-TWT, at *6. In *Waters*, a newspaper published photographs of a murdered child's deceased body, as illustrative of an article about her murder and the subsequent investigation. Benoit's situation is distinct from the situation in *Waters.* In *Waters*, the offensive photographs were of the child's deceased body, and as such were directly related to the "incident of public interest" – the child's death. LFP published photographs of Benoit that were at least twenty years old to correspond to a brief discussion about her aspiring career as a model. Those photographs had no relation to her death. Her aspiring nude modeling career at no time developed into an incident of public concern, and for good reason– Benoit sought the destruction of all of those images.

19

LFP may not make public private, nude images of Benoit that she, allegedly, expressly did not wish made public, simply because she once wished to be a model and was then murdered. "[W]hen a person is involuntarily involved in a newsworthy incident, not all aspects of the person's life, and not everything the person says or does, is thereby rendered newsworthy." *Shulman*, 955 P.2d at 484.

We agree with the Ninth Circuit that "[m]ost persons are connected with some activity, vocational or avocational, as to which the public can be said as a matter of law to have a legitimate interest or curiosity. To hold as a matter of law that private facts as to such persons are also within the area of legitimate public interest could indirectly expose everyone's private life to public view." *Virgil,* 527 F.2d at 1131.

Moreover, we are guided by the Tenth Circuit's conclusion that "[b]ecause each member of our society at some time engages in an activity that fairly could be characterized as a matter of legitimate public concern, to permit that activity to open the door to the exposure of any truthful secret about that person would render meaningless the tort of public disclosure of private facts." *Gilbert v. Med. Econ. Co.*, 665 F.2d 305, 308 (10th Cir. 1981). We agree with the Tenth Circuit that the First Amendment "does not require such a result. Therefore, to properly balance freedom of the press against the right of privacy, *every private fact disclosed in an*

20

*otherwise truthful, newsworthy publication must have some substantial relevance to a matter of legitimate public interest.*" *Id.* (emphasis added). *See also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1232 (7th Cir. 1993) ("An individual, and more pertinently perhaps the community, is most offended by the publication of intimate personal facts when the community has no interest in them beyond the voyeuristic thrill of penetrating the wall of privacy that surrounds a stranger.").

The photographs published by LFP neither relate to the incident of public concern conceptually nor correspond with the time period during which Benoit was rendered, against her will, the subject of public scrutiny. The photographs bear no relevance– let alone "substantial relevance"– to the "matter of legitimate public interest." *Gilbert*, 665 F.2d at 208. On these facts, were we to hold otherwise, LFP would be free to publish any nude photographs of almost anyone without their permission, simply because the fact that they were caught nude on camera strikes someone as "newsworthy." Surely that debases the very concept of a right to privacy.

### III. Economic Ramifications of LFP's Publication of the Photographs

Finally, we are guided by the Seventh Circuit's opinion in *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128 (7th Cir. 1985), to conclude that LFP may be held liable in damages for violation of the right of publicity when it published

21

images of Benoit that had economic value without her permission– let alone without compensating her estate.

The *Douglass* case has many similarities to this case. Robyn Douglass posed nude for *Playboy* magazine and images from that shoot were published in *Playboy*. Later, *Hustler* ascertained other, previously unpublished photographs of Douglass from the photographer and published them in *Hustler* without Douglass' permission and without compensating her. *Hustler* published these images alongside biographical information about Douglass' acting career. Douglass brought suit seeking compensation for the violation of her right of publicity. Much like in this case, *Hustler* argued that Douglass was newsworthy and that "Robyn Douglass Nude" was fair comment on her career.

The Seventh Circuit disagreed:

> Robyn Douglass or her agents must have control over the dissemination of her nude photographs if their value is to be maximized. *Hustler* can run a story on her and use any photographs that are in the public domain or that it can buy but it cannot use photographs made by others for commercial purposes and (temporarily) withheld from public distribution.
>
> The unauthorized publication did impair the commercial exploitation of Douglass'[] talents, though probably not as much as she asserts and mainly because of where they were published. But an important aspect of the 'right of publicity' is being able to control the place as well as time and number of one's public appearances; for example, no celebrity sells his name or likeness for advertising purposes to all comers. In any event, Douglass was not paid by

22

*Hustler* for the right to publish nude photos of her.

*Id.* at 1138-39 (citation omitted). Likewise, LFP has published photographs of Benoit in *Hustler* without the permission of her estate and without compensation and attempts to justify their publication as comment on her career.

Notably, the primary difference between Douglass' case and Benoit's case is that Benoit does not seem to have ever sought to have nude photographs of herself published. As stated by the Supreme Court of Georgia, "a person who avoids exploitation during life is entitled to have his image protected against exploitation after death just as much *if not more than* a person who exploited his image during life." *Martin Luther King*, 296 S.E.2d at 706 (emphasis added).

We agree with the Seventh Circuit that this "unauthorized publication" impaired "the commercial exploitation" of Benoit's image. Certainly, "an important aspect of the 'right of publicity' is being able to control the place as well as time and number of one's public appearances. . . ." *Douglass*, 769 F.2d at 1138. Crude though the concept may seem in this context, Toffoloni is entitled to control when and whether images of her daughter are made public in order to maximize the economic benefit to be derived from her daughter's posthumous fame.

**D.    Conclusion**

These private, nude photographs were not incident to a newsworthy article; rather, the brief biography was incident to the photographs. Additionally, these photographs were neither related in time nor concept to the current incident of public interest. We hold that these photographs do not qualify for the newsworthiness exception to the right of publicity. Accordingly, we reverse and remand for further proceedings.

**REVERSED AND REMANDED.**