[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-12922
_____

D. C. Docket No. 1:08-cv-00421-TWT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 1, 2012
JOHN LEY
CLERK

MAUREEN TOFFOLONI,
as Administrator and Personal Representative
of the Estate of Nancy E. Benoit,

Plaintiff-Appellant
Cross-Appellee,

versus

LFP PUBLISHING GROUP, LLC,
d.b.a. Hustler Magazine.

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(May 1, 2012)

Before EDMONDSON, ANDERSON, and FARRIS,* Circuit Judges.
_____
*Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

PER CURIAM:

This is the second appeal in this case. In the first appeal ("Hustler I"), we held that Maureen Toffoloni's complaint had stated a claim against LFP Publishing Group, LLC ("LFP"), for a violation of Nancy Benoit's right of publicity.[1] Toffoloni v. LFP Publ'g Grp., LLC (Hustler I), 572 F.3d 1201, 1213 (11th Cir. 2009). The case stems from the publication of twenty-year-old nude photographs of Benoit in the March 2008 issue of Hustler magazine, less than a year after Benoit was murdered. Id. at 1204.

The facts surrounding the content and context of the photographs themselves were fully discussed in Hustler I, id. at 1204-05, 1209-12, and we need not recount them again. After our decision in Hustler I, the case was remanded to the district court, which oversaw discovery and then granted partial summary judgment to Toffoloni on the issue of liability. The amount of damages was submitted to a jury, which found in favor of Toffoloni in the amount of $125,000 in compensatory damages, plus an additional $19,603,600 in punitive damages. The district court

---

[1] Toffoloni is Benoit's mother and the administrator of Benoit's estate. Hustler I, 572 F.3d at 1204. In Georgia, the right of publicity survives the death of its owner and is inheritable and devisable. Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc., 296 S.E.2d 697, 705 (Ga. 1982).

reduced the punitive award to $250,000.[2]

Both parties appeal the amount of punitive damages, with Toffoloni arguing that the original award of $19,603,600 should be reinstated, and LFP arguing that there should be no punitive damages at all.[3]

## PUNITIVE DAMAGES

Toffoloni argues that the jury's verdict of $19,603,600 in punitive damages should be reinstated because the district court failed to give due deference to the jury's finding that LFP intended to harm Toffoloni. On the other hand, LFP argues

---

[2]    For all torts except products liability actions, Georgia limits punitive damages to $250,000 unless "the defendant acted, or failed to act, with the specific intent to cause harm" or was under the influence of "alcohol, drugs . . . or any intentionally consumed glue, aerosol, or other toxic vapor." O.C.G.A. § 51-12-5.1(f); McDaniel v. Elliott, 497 S.E.2d 786, 787 & n.1 (Ga. 1998). The district court concluded that there was insufficient evidence to support such a finding in this case and thus reduced the punitive damages to the maximum allowed under the cap.

[3]    LFP also argues on appeal that the district court incorrectly interpreted this Court's Hustler I opinion as ruling conclusively that the Benoit photographs were not newsworthy. Although LFP's argument may have validity, LFP overlooks the fact that the district court, in an alternative holding, addressed the only three new facts to which LFP pointed as new and different evidence revealed by the fully developed record. The district court concluded that these new facts did not constitute a significant difference from those underlying Hustler I. Again on appeal, LFP asserts only the same three facts as a warrant for us to depart from Hustler I's decision on newsworthiness. We have entertained only new evidence with respect to these three, specific facts as additions to the record considered by Hustler I, deeming any additional argument or differences abandoned. See United States v. Day, 405 F.3d 1293, 1294 n.1 (11th Cir. 2005) ("This Court has a well-established rule that issues and contentions not timely raised in the initial brief are deemed waived or abandoned."). With respect to LFP's third new fact, we note that Professor Lisby's testimony has some relevance, and we have considered that testimony. We cannot conclude that the district court erred in its holding that any new evidence with respect to these three facts did not significantly change the substance of the issue. Indeed, one of the new facts was irrelevant, and evidence with respect to the others would have been largely encompassed in the common experience that judges would have already applied.

that no reasonable jury could have found that punitive damages were warranted.

Under Georgia law, an award of punitive damages for a violation of the right of publicity is permitted where the jury finds "that the acts of the defendant have been of a character to import premeditation or knowledge and consciousness of the appropriation and its continuation." Cabaniss v. Hipsley, 151 S.E.2d 496, 509 (Ga. Ct. App. 1966); see also Alonso v. Parfet, 325 S.E.2d 152, 154 (Ga. 1985). The facts supporting punitive damages must be found by clear and convincing evidence. O.C.G.A. § 51-12-5.1(b); Kothari v. Patel, 585 S.E.2d 97 (Ga. Ct. App. 2003).

However, a defendant operating under an innocent mistake cannot be held liable for punitive damages. "Something more than the mere commission of a tort is always required for punitive damages. . . . [M]ere negligence is not enough, even though it is so extreme in degree as to be characterized as gross . . . . Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort." Colonial Pipeline Co. v. Brown, 365 S.E.2d 827, 832 (Ga. 1988) (quotations omitted).

We agree with LFP that no reasonable jury could find clear and convincing evidence to support the imposition of punitive damages. Id.; Alonso, 325 S.E.2d at 154; Cabaniss, 151 S.E.2d at 509. There was substantial, consistent, and uncontroverted testimony from numerous LFP employees showing that they

4

honestly and reasonably (albeit mistakenly) believed at the time that the photographs fit under the newsworthiness exception to the right of publicity.

Larry Flynt, who owns LFP and must sign off on the contents of each magazine, testified that when the Benoit images were proposed for publication, he thought that they were "clearly" newsworthy and thus LFP did not need Benoit's or Toffoloni's permission to publish them. Flynt testified that LFP would not have run the photographs if it thought that it needed permission.

Tyler Downey, who wrote the summary accompanying the photographs, said that LFP deviated from its normal custom by deciding to contact its attorneys even before the photographs were purchased from the photographer. Downey said he thought that LFP did not need permission to publish the photographs because Benoit had been "in the news so much" and also because he believed that any rights would have been extinguished by Benoit's death. Downey testified that the only reason he was involved with the images was because LFP ran them in its editorial section, which is reserved for content that LFP believes is "news and entertainment," as opposed to nude "pictorials."

Several weeks before the March 2008 issue was released, Benoit's former husband Jim Daus called Downey and inquired if LFP had permission to publish the images. Downey testified that he told Daus that "it was a news story and that to

5

print a news story we don't really need permission from [Benoit] or the family." Daus similarly recounted Downey's response: "[Downey] said that they checked with their legal department. It was all legal 'cause it was newsworthy is what he told me."

When told that Hustler I had indicated that the photographs were not newsworthy, Downey replied, "But it was – it was very clearly an honest mistake. . . . [W]e were operating under the idea that we – what we were doing was perfectly legal." Downey also testified that he believed that no permission was necessary because he did not see any legal distinction between these photographs of Benoit and paparazzi photographs of celebrities that were published in other magazines without the celebrities' permission.

About a week after the issue was publically released in the United States, Toffoloni's counsel sent a letter to LFP demanding that the photographs not be published. Donna Hahner, who is LFP's corporate vice president, forwarded the letter to LFP's legal advisors, who drafted a response to Toffoloni's counsel. The response acknowledged Georgia's right of publicity but insisted that no permission was necessary because the photographs were "being used to illustrate a legitimate and serious news article . . . on [Benoit's] life . . . . Thus, we are not dealing with a commercial exploitation of Ms. Benoit's image for monetary gain, but as part of a

6

legitimate news story."

Hahner testified that "everyone in the company felt we were on firm, solid legal ground that we had the right to freedom of press, that we had the right to publish photographs. They were newsworthy. We were writing a news article amidst a flurry of news reporting about Nancy Benoit's early life." Notwithstanding this firm conviction, LFP made every reasonable effort to stop any further dissemination of the pictures.

Toffoloni presented no testimony or evidence to contradict the conclusion that LFP's employees honestly believed the photographs to be newsworthy. This belief precludes a finding of premeditation or knowledge that LFP's acts would violate Benoit's right of publicity. See Colonial Pipeline, 365 S.E.2d at 832; Alonso, 325 S.E.2d at 154; Cabaniss, 151 S.E.2d at 509. If the images had been newsworthy, LFP would not have needed permission to publish them. See Hustler I, 572 F.3d at 1208. Thus, the fact that LFP knew that it had never received permission from Benoit or Toffoloni is not helpful to Toffoloni's case.

Supporting the reasonableness of LFP's beliefs is the fact that its legal team was consulted at least three times with respect to the photographs: (1) before LFP bought the images, (2) before the March 2008 issue was published, and (3) when Toffoloni's counsel sent a letter demanding that the photographs not be published.

Each time, the legal department told LFP that it was permissible to publish the photographs.

The strongest evidence supporting our conclusion that this mistake on LFP's part was reasonable is the fact that the district court in this case initially dismissed Toffoloni's case because the court agreed with LFP that the photographs met the newsworthiness exception. Toffoloni v. LFP Publ'g Grp., No. 1:08-cv-421-TWT, 2008 WL 4559866, at *2-3 (N.D. Ga. Oct. 6, 2008). Although that decision of the district court was ultimately reversed in Hustler I, we do not believe that publishers should be held to a higher standard than that of the learned district judge.

Because there was overwhelming evidence that LFP reasonably and honestly (albeit mistakenly) believed that the photographs were subject to the newsworthiness exception to the right of publicity, we conclude that no reasonable jury could find by clear and convincing evidence that punitive damages were warranted in this case. O.C.G.A. § 51-12-5.1(b); Colonial Pipeline, 365 S.E.2d at 832; Alonso, 325 S.E.2d at 154; Cabaniss, 151 S.E.2d at 509. Accordingly, we remand to the district court with instructions to vacate the award of $250,000 in punitive damages.[4]

---

[4] Because we find that no punitive damages were warranted, we do not need to address Toffoloni's argument that the $19,603,600 award should be reinstated. For the same reasons, we need not address LFP's argument that the district court abused its discretion in excluding LFP's expert witness, Professor Lisby, because his testimony had primary relevance to

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

---

the now moot punitive damages issue. His testimony may also have had some relevance to the newsworthiness issue, and may have added somewhat to the common experience that the district court surely brought to his decision; therefore, we have considered the testimony in our review of the three new facts urged by LFP with respect to the newsworthiness issue. See note 3, supra.